# FRANK F. HARDING
*v.*
# AMY B. ZIMMERMAN ET AL.

---

Equity, No. 842.

A hotel partnership was not dissolved by the acts of a member in notifying the other partner in writing that he elected to terminate the partnership for the general reason that the other partner had failed to keep his partnership obligations, and had not conducted himself properly in his portion of the business, in taking into his sole possession the property and assets of the partnership, and in excluding the remaining ·partner from a joint share in the management and profits thereof.

Opinion filed May 18, 1912.

---

*Messrs. Willis Sweet* and *H. H. Scoville* for complainant.

*Mr. N. B. K. Pettingill* for respondents.

CHARLTON, Judge, delivered the following opinion:

In the month of January, 1911, the complainant Harding entered into negotiations with the respondent Jacob Axtmayer and Anna, his wife, for a lease of the premises known as the Eureka-Miramar Hotel, at Santurce, a suburb of San Juan, which premises consist of two structures, one of wood, and one of stone, and were at that time being operated by the respondents Axtmayer as a hotel. It appears from the evidence that the terms proposed by said Axtmayers were too onerous, in a financial way, for the complainant Harding to accept, and he requested the respondents Axtmayer to permit him to associate another person with him in the lease and operation of said premises. To this proposal the respondents Axtmayer finally consented, and on February 1, 1911, it is alleged by all parties that a lease was entered into in writing, although it never was produced in court or offered in evidence. Said lease substantially provided for the leasing to Harding and Zimmerman of the two houses constituting the Eureka-Miramar Hotel, at a monthly rental of $600, for a period of two years, with the option of a renewal for two years at the expiration of the term, and a requirement that the lessees should deposit with the respondents Axtmayer and his wife the sum of $3,000 in cash, in lieu of a bond for rent. It was also in evidence that the lease contained an option of purchase of certain other properties in that vicinity belonging to the respondents Axtmayer, at a price of $90,000, to be exercised during the continuance of. the lease. The testimony in that regard was so indeterminate as to offer no legal basis by which the court could come to a conclusion as to the value of said option. In any event, it was never attempt-

ed to be acted upon by the parties, and the fact that it is virtual-
ly abandoned is evidenced by the construction, by the respond-
ents Axtmayer, of a building adjoining the Eureka-Miramar
Hotel, on a portion of the premises covered by said option.

About the same date, February 1, 1911, the complainant
Harding and the respondent Zimmerman entered into what is
alleged to have been a verbal contract, under and by virtue of
the terms whereof they were to operate the Eureka-Miramar
Hotel as a partnership.   No definite term for the duration of
the partnership seems to have been fixed or agreed upon between
the parties thereto.   In order to provide funds for making the
deposit required by the lease, and for purchasing certain fur-
niture and supplies then contained in said hotel, it was necessary
for the partnership to provide itself with funds to the amount of
$4,000, which was furnished in the following manner:   The
respondent Zimmerman contributed $1,500 in cash, and the com-
plainant Harding $500 in cash; the remaining $2,000 was the
proceeds of a note of Harding & Zimmerman to the Royal Bank
of Canada, payable in six months, or upon July 1, 1911, and it
appears from the evidence that the inequality in cash contribu-
tion was to be balanced by the liability for the payment of the
note above referred to.   The evidence is conflicting as to what
the exact agreement between the signers was, but the weight of
evidence appears to be to the effect that Harding was to provide
$1,500 of the amount and Zimmerman $500.   The mutual duties
of the partnership were to be the charge, by the complainant, of
the office of the hotel, of the assignment of guests to rooms, of
the operation of the café and of the dining room; while the re-
spondent Zimmerman was to have charge of the operation of
the rooms occupied by guests, of the housekeeping, and the pur-

chase of supplies for the house and for the kitchen. This duty she was to perform by a proxy to be furnished by her without cost of the partnership, as the respondent Zimmerman was privately engaged in a business in the city of San Juan, which occupied her fully during the business hours of the day.

The hotel was operated with considerable success under this arrangement, until, in the month of April, 1911, the respondent Zimmerman left San Juan for a visit to the United States, returning about July 1, 1911. Seven days thereafter, or upon July 8, 1911, the complainant Harding departed for the United States on his vacation, leaving the respondent Zimmerman in full charge of the hotel. On August 8, 1911, the respondent Zimmerman notified the complainant Harding in writing that she elected to terminate the partnership for the general reason that the complainant had failed to keep his partnership obligation, and had not conducted himself properly in his portion of the business, without definite specification, so far as is shown by the evidence, of the lapses which she alleged him to have made. It may be noted in passing that this letter of notification to Harding by the respondent Zimmerman was never put in evidence. When the complainant Harding returned to San Juan early in September, 1911, he found that the respondent Zimmerman had taken full charge of the business, had transferred the bank account of Harding & Zimmerman into her own name, and into another bank, and declined to permit him to enter the hotel, or to take any part in its operation.

Subsequently, and up to this date, the defendant Zimmerman has continued in the sole operation of said hotel property, and the plaintiff Harding has been excluded from any participation

Harding v. Zimmerman.

therein, either as to the management thereof, or as to participation in the profits resulting form such operation, if any.

The testimony on behalf of the respondent, in justification of her attempted termination of the partnership, showed that the method of primary entry of the accounts of the partnership was by the card index system; that these cards were kept in the office of the hotel, and were supposed to contain all charges that could legitimately be made against guests, for their board, laundry, advances, bar charges, and otherwise. These entries were primarily supposed to be made by the plaintiff, and it appears for the most part they were so made. The receipts from the bar were placed in a cigar box, at the close of the business day, and were taken, either by the complainant or the barkeeper, to the room of the plaintiff in the hotel, where they were kept until the next day. From the cash so obtained, or from cash paid by guests and placed in the safe of the hotel, deposits were made in the bank, petty bills were paid at the hotel, and advances were from time to time made to guests, the latter being supposed to be entered in each case upon an appropriate card in the card index. In some cases this was not done, and required to be supplemented by oral evidence or memoranda contained on loose sheets of paper. It was customary to have a bookkeeper, otherwise engaged during the day, come each evening, and he, with the assistance and under the direction of the respondent, made entries in the books of the partnership of the various transactions of the day. The complainant does not appear to have participated in the posting of the books.

The whole conduct of this business, from a financial point of view, was so grossly loose and childishly incompetent that only the large patronage which it enjoyed, amounting practically to a

monopoly, saved it from involving the parties in serious financial loss and failure. It is almost inconceivable that two persons of full age and in possession of normal faculties could have so conducted a business involving the amounts here considered. In any event, and without affirmative action by either party, it is probable that the partnership would soon have terminated itself, as a necessary result of the method of the management of the business.

After hearing all the testimony that was offered on either side, and after able and exhaustive argument by counsel for both parties, the case was finally submitted for my consideration upon February 16, 1912. Since that time I have exhaustively and carefully gone over all the evidence submitted, both oral and written, including the report of an accountant heretofore appointed, which gave in detail the operation of the business from its inception on February 1, 1911, up to and including December 30, 1911. I have also carefully considered the cases submitted by counsel for both parties, and have reviewed their arguments as to fact and law.

Whatever unfounded, loose, and intemperate statements a nervous woman may make to counsel in advance of the bringing of a case, it is when evidence is submitted to the test of a cross-examination in a judicial trial that the real basis of the fact is made apparent. This was more signally illustrated in the testimony of both the parties in this case, and especially that of the respondent, than I remember to have observed it in any other matter that has come before me.

I am of opinion that, under all the evidence and under the existing law, not only of Porto Rico in relation to partnerships, but also the general jurisprudence of the United States,

VI. Porto Rico—6.

the respondent Zimmerman was without legal warrant in taking into her sole possession the property and assets of the partnership upon August 8, 1911, and in excluding the complainant from a joint share in the management and profits thereof, and that her action taken upon said last-mentioned date, did not, in law, dissolve said partnership, but that, in spite of the physical exclusion of complainant from said business, said partnership has continued in force until this date.

Testimony was introduced on behalf of the respondent, tending to show gross carelessness in the manner in which the plaintiff handled the cash receipts at the bar, and, from oral and other evidence, including the testimony of the parties hereto, and of the barkeeper, and from the report of the accountant filed herein, it would seem that the sum of $618, as an approximate amount, would remain to be accounted for by the complainant from such receipts, and that he should be surcharged therewith.

The respondents Axtmayer and wife, having interjected themselves into this proceeding, and having taken a position so anomalous as to be irreconcilable with any facts of the case in dispute between the parties, have subjected themselves and their rights to the adjudication of this court. They hold the sum of $3,000 cash, an asset of the partnership, in lieu of a bond for rent; the lease to Harding & Zimmerman is still in existence, and the rent is not in default, and yet they attempt to dispose of the same in a manner to suit their own convenience, and without regard to any rights which either of the parties hereto may possess.

The whole case is surrounded with such inconceivable inconsistencies, and shows such lack of business knowledge and sense

in the parties, as to make it difficult to be dealt with in a practical way upon the dissolution of this partnership.

It is therefore hereby ordered that the partnership heretofore existing between Frank F. Harding and Amy B. Zimmerman, in the management and operation of the property and business known as the Hotel Eureka-Miramar, in San Juan, Porto Rico, is hereby dissolved as of this date, and John L. Haas is hereby appointed special master of this court, with the direction that he shall immediately take charge of and operate said property and business and its assets, including furnishings, supplies, cash in hand and on deposit, the lease of the premises, and any and all property and assets thereof which are now in the possession of the respondent Amy B. Zimmerman, or any other person or persons for her or in her behalf. And such persons, and each of them are hereby ordered to deliver to the special master herein appointed all of such property and assets, of every name and nature. The special master is further ordered and directed to take into his possession, as such special master, any and all sums of money, whether cash in hand in said hotel, or on deposit in any bank within this district, for the purpose of carrying out this decree. He is ordered, further, to make a careful and true inventory of all the property and assets of said partnership, and to sell the same, as special master of this court, at public auction upon said premises, after advertisement in a daily newspaper published in the city of San Juan, Porto Rico, and in a daily newspaper published in the city of New York, state of New York, for a period of thirty days in each. The special master is authorized and directed to accept at said sale the highest and best price therefor, for which he receives a responsible cash bid;

Harding v. Zimmerman.

he is authorized and directed to sell said properties, either as a whole and as a going concern, or in such parcels or parts, as may be most for the benefit of said partnership, but he is authorized to refuse any or all bids for said property or assets, or any part thereof, in case he shall deem the same inadequate, and he is authorized to place the purchaser or purchasers at said sale in possession of any property or assets purchased thereat, including the unexpired lease of the hotel premises; and respondents Axtmayer are hereby required to accept as a tenant the purchaser of said unexpired lease, provided such purchaser shall comply with the terms of said lease, and other conditions, as to security and otherwise, in relation thereto.

When such special master shall have reduced to cash all the property and assets of said partnership, he shall make a report of his doings in that behalf to this court; shall state an account of the operation of said partnership from February 1, 1911, to this date, and the independent accounts of the parties hereto in relation to said business, in which the complainant herein shall be surcharged the sum of $618 on account of bar receipts, and for the purpose of said account he is hereby authorized to employ the services of a certified accountant to be selected by him.

Until said sale is made by said special master, and the properties sold thereunder shall be delivered, he shall continue to operate the said Hotel Eureka-Miramar for the benefit of said partnership. The said special master is to give a bond in the sum of $2,500 for the faithful performance of his duty, with sureties to be approved by the court.